**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**Charleston Division**

| | |
|---|---|
| JOHN DOE, a minor, by his parents and next friends, JIM DOE and JANE DOE, et al.,<br><br>                Plaintiffs,<br><br>       v.<br><br>STATE OF SOUTH CAROLINA, et al.,<br><br>                Defendants. | No. 2:24-cv-06420-RMG |

**REBUTTAL EXPERT WITNESS DECLARATION**
**OF DR. STEPHANIE L. BUDGE**

I, Stephanie Budge, Ph.D., hereby declare as follows:

1.      I submit this rebuttal expert report based on my personal knowledge.

2.      I have been retained by counsel for the Plaintiffs as an expert in the above-captioned lawsuit (the "lawsuit") to provide my expert opinions on certain issues relating to the lawsuit. This rebuttal declaration addresses the following issues raised in the declaration of Dr. Geeta Nangia, submitted by Defendants in opposition to Plaintiff John Doe's motions for preliminary injunction and class certification: 1) my opinion on the qualifications of Dr. Nangia to offer an opinion on issues in this case; 2) how sex is comprised of multiple components and why gender identity is the most important of those components in determining someone's sex; 3) the limitations of the Cass Review and strengths of the WPATH guidelines; 4) the state of the science on persistence/desistance of transgender identity in children and adolescents; 5) the importance of social transition in transgender minors, 6) single occupancy restrooms and transgender youth; 7) Dr. Nangia's attempted justification of Proviso 1.120 as allegedly protective of transgender

students, 8) cisgender students' experiences of "felt safety" in regard to transgender youth; 9) transgender youth identification and reliability of the Williams Institute data; and 10) Dr. Nangia's allegations that I am "biased."

3.      My opinions contained in this rebuttal declaration are based on: 1) my clinical experience as a licensed psychologist working with approximately 200 transgender patients since 2007 through the provision of individual therapy, group therapy, psychological evaluations, and supervision of others' clinical work; 2) my knowledge of the peer-reviewed research, including my own, regarding, among other things, the impact of discrimination on transgender people; and 3) my work training mental health providers to use evidence-based practice and up-to-date standards of care, specifically in working with transgender patients.

4.      I reviewed the declarations of Dr. Nangia submitted in this lawsuit and read the transcript of her deposition. In this rebuttal declaration, I respond to several of the central points in her declaration as well as her deposition. I may not address all studies or citations directly but instead focus on the conclusions from her report. I may further supplement these opinions in response to additional information from state defendants' experts.[1]

## I.      DR. NANGIA DOES NOT HAVE THE LEVEL OF EXPERTISE REQUIRED TO PROVIDE EXPERT OPINIONS REGARDING THE ISSUES RAISED IN MY INITIAL DECLARATION

5.      Dr. Nangia's CV does not list any information that demonstrates her expertise for working with transgender youth or being able to evaluate the research and clinical recommendations for transgender youth. She does not provide any information that demonstrates involvement in research projects or information related to research training that lends to her ability

---

[1] The Plaintiffs' attorneys have informed me that all the portions of Dr. Nangia's deposition that I reference in this deposition will be made available to the Court in an exhibit to Patrick Archer's supplemental declaration.

to focus on the science related to discrimination, restroom use, and transgender youth. The lack of scholarship she uses to support her claims in her report is notable, and it demonstrates a lack of knowledge about the robust research available regarding the state of the science on transgender youth. As well, her CV does not demonstrate any specific clinical training that focuses on working with transgender youth.

6.     When she was asked about her experience working with transgender youth in her deposition, she claims that she assesses for gender dysphoria but that she will not chart the diagnosis as a matter of personal practice, even if a patient meets criteria for the diagnosis, due to her incorrect belief that most patients do not continue to meet criteria without treatment and due to stigma from the diagnosis. It appears that she does not give patients the option of whether or not they would like the diagnosis in their chart when they meet criteria. This practice goes against the American Psychiatric Association Commentary on Ethics in Practice recommendations around diagnoses (see Topic 2.3.4, p. 8), which states: "Psychiatrists should recognize the importance of informed consent for assessment or treatment as an essential means to provide recognition of and respect for the patient's autonomy and personhood. Informed consent is an ongoing process that involves disclosing information important to the patient and/or decision-maker, ensuring the patient/decision-maker has the capacity to make treatment decisions, and avoiding coercive influences.  Typical elements of disclosure include an accurate description of the diagnosis and the proposed treatment, its potential risks and benefits, any relevant alternatives, including no treatment at all, and the relative risks and benefits of each option." Nangia's practice is concerning, given that patients are not allowed the informed consent to decide if they prefer to have their diagnostic codes charted, it leaves the decision-making fully up to a clinician, and that it is not based upon the scientific basis about the presence and treatment for gender dysphoria.

7.     In addition, the American Psychiatric Association Commentary on Ethics in Practice states: "A psychiatrist may render a professional opinion about an individual after an appropriate clinical examination and accompanying waiver of confidentiality and should not do so unless the examination and waiver have occurred (see topic 3.4.6, p.16)." In her report, Dr. Nangia makes diagnostic conclusions without meeting with John Doe, which is not in accordance with her profession's outlines for ethical clinical practice or with her own standard of practice (see Dr. Nangia's deposition, starting on page 43).

## II.     DEFINITION OF SEX

8.     In her report, Dr. Nangia does not dispute that major medical and psychological associations, relying on large bodies of literature and scientific consensus, have concluded that gender identity is a component of one's sex. To support her contrary opinion, Dr. Nangia relies on a single postdoctoral scholar's quote from an essay (Marinov, 2019) and a commentary (Cretella et al., 2019). Commentaries are typically not peer-reviewed and instead offer comment on another scholar's work rather than being an independent article. Neither of these citations are peer-reviewed or representative of a general scientific consensus about the definition of sex. As noted above, major medical and psychological associations agree that sex is multifaceted, comprised of chromosomes, hormones, internal and external genitalia, secondary sex characteristics, and gender identity (e.g., American Academy of Pediatrics, 2018; American Psychological Association, 2014; American Psychological Association, 2021; American Psychiatric Association, 2017; American Medical Association, 2018). To be more specific, American Medical Association Board member Dr. William Kobler has explained: "Sex and gender are more complex than previously assumed. It is essential to acknowledge that an individual's gender identity may not align with the sex assigned to them at birth. A narrow limit on the definition of sex would have public health consequences for the transgender population and individuals born with differences in sexual

4

differentiation, also known as intersex traits" (AMA, 2018).

9.     Given the complexity of sex, it is the prevailing clinical consensus and my professional opinion that the most important determiner of sex is gender identity. As noted above, the data are clear that one's gender identity cannot be changed and that it is a "deeply felt, inherent sense" (APA, 2015). As an example of this, when a cisgender man or woman experiences injuries or illness that impact their internal and external genitalia or secondary sex characteristics, their gender identity is considered central to considerations for reconstructive surgeries or treatments. The data are comprehensive and overwhelmingly indicate the importance of supporting transgender youth's gender identity (e.g., Austin et al., 2022; Durwood et al., 2021; Johns et al., 2018). When transgender youth are not believed, not supported, or required to delay social transition, dire consequences follow—including but not limited to attempted and completed suicide, depression, anxiety, trauma, and non-suicidal self-injury (see my prior declaration, paragraphs 41, 48, 63, for the full scope of supporting data).

10.     As well, there is irrefutable evidence that a person's gender identity cannot be changed (either from transgender to cisgender or from cisgender to transgender). The evidence also indicates that not only can you not change transgender youth's or adults' gender identity, but that it is incredibly harmful to attempt to change their identity. There are numerous sources indicating the harmful and unethical nature of these types of treatments (usually called reparative therapies or conversion therapies). For example, the American Psychological Association's statement on gender diversity and transgender identity in adolescents indicates: "attempts to force gender diverse and transgender youth to change their behavior to fit into social norms may traumatize the youth and stifle their development into healthy adults" (p. 2, Mizock et al., 2015). Data analyzed for over 27,000 transgender participants indicates that gender identity conversion

efforts were associated with increased odds of psychological distress and lifetime suicide attempts when compared with transgender participants who had not been exposed to gender identity conversion efforts (Heiden-Roots et al., 2022; Turban et al., 2020). Data from the Turban study indicate an increase in the lifetime odds of suicide attempts for participants who reported engaging in conversion therapies prior to age 10. These U.S. data are supported by analyses of international data indicating similar outcomes (see Lee et al., 2023; Veale et al., 2022).

### III.     CASS REVIEW AND WPATH STANDARDS OF CARE V.8

11.     Dr. Nangia relies heavily on the Cass Review—a non-peer-reviewed report released by Dr. Hilary Cass, a medical provider in the UK, in 2024. As noted by Dr. Nangia, the Cass Review primarily focuses on conclusions related to *medical* transition and does not focus on social transition or address, in any way, restroom policy recommendations for transgender youth. In a search of the Cass Review, there is no mention of restrooms, bathrooms, or toilets in the entire review and thus the authors do not make any conclusions that are relevant to this particular case. As well, the Cass Review indicates that of individual approaches to treatment for adolescents are essential and that adolescents have agency through which they can engage in decision-making regarding social transition; the Cass Review recommendations for social transition are not in alignment with Dr. Nangia's conclusions regarding social transitioning for adolescents.

12.     However, even though this report is not particularly relevant in this case because of its focus on gender affirming medical care, there are journal articles (Grijseels, 2024; Horton, 2024) and an evidence-based critique (McNamara et al., 2024) that have been published recently that discuss the significant limitations of the Cass Review. As noted by these outlets, the Cass Review does not recommend a ban of gender affirming medical care. As well, the Cass Review notes the importance of evidence quality—that is, of ensuring that the quality of the evidence that underlies scientific conclusions is robust, well-conducted, and appropriate—but does not define

how they established evidence quality, nor does the review use this established system. The GRADE framework is the most accepted framework for determining evidence quality. Its developers note that several different considerations should be taken into account for determining medical decision-making, but the Cass Review does not take these considerations into account. The GRADE framework (see Guyatt et al., 2008) notes the importance of understanding: 1) evidence certainty and quality, 2) balancing benefits and harms, and 3) patient values and preferences. The Cass Review ignores the evidence of peer reviewed science that demonstrates positive outcomes of gender affirming medical care for transgender youth, does not consider the harms of not providing gender affirming medical care for transgender youth, and ignores the findings regarding patient values and preferences.

13.     Dr. Nangia focuses a great deal on critiquing the WPATH Standards of Care v.8 and relies on the Cass Review critiques of the standards of care. Unlike the Cass Review, the WPATH standards of care were authored by 100+ researchers from around the globe who offer a wide range of perspectives and expertise; the Cass Review only has one author who was commissioned from one specific area of the world, the UK, for the specific purpose of providing recommendations to the UK's National Health Service on how to address the medical treatment needs of transgender young people. Also, the WPATH standards of care note: "The process for development of the SOC-8 [WPATH Standards of Care, version 8] incorporated recommendations on clinical practice guideline development from the National Academies of Medicine and The World Health Organization that addressed transparency, the conflict-of-interest policy, committee composition and group process" p.247.  There was a guideline methodologist who assisted with the development of questions and an independent team who focused on systematic reviews that were used to inform the statements for recommendations. There was an extensive feedback period

where international scholars were invited to provide commentary and feedback was incorporated into the process and recommendations for the guidelines. Recommendations for the standards of care are based on evidence that supports interventions and focuses on the risks and harms, as well as the international context at hand with regard to recommendations. The WPATH SOC v8 notes: "Consensus of the final recommendations was attained using a Delphi process that included all members of the Standards of Care Revision committee and required that recommendation statements were approved by 75% of members" (p. 247).

14.     Dr. Nangia's primary critiques focus on "leaked" data, which include singular quotes from WPATH members/guideline writers that are cherry picked without providing context for the quotations that would allow a reader to understand what the quoted speaker was saying. She also hypothesizes that politics may have interfered with the guidelines, but she does not provide any information or evidence to support that political considerations influenced the guidelines. Moreover, she only focuses on US politics, even though the WPATH Guidelines are an international document. Dr. Nangia's criticism of the Guideline's omission of age limits for certain intervention is also off base. My understanding is that age limits were not included in the document because the age of majority and age-based limits on medical decision-making differ from country to country, and age recommendations can be provided using regional guidelines.

## IV.     PERSISTENCE AND DETRANSITIONING:

15.     In paragraph 52 of her report, Dr. Nangia falsely claims that there is a "high rate of natural desistance of gender incongruence." Dr. Nangia refers to a "review" of 11 clinical cohort studies that supposedly support her claim, but she does not cite or otherwise indicate what this review is. The studies she does cite (#35-45) are primarily 30-40+ years old and predate the contemporary clinical diagnosis of Gender Dysphoria, which was not recognized until the publication of the DSM-5 in 2013. Her statements regarding desistance rates are made largely

based on a body of research that has been demonstrated to be inapplicable to transgender youth and her own unverifiable claims that her own patients with gender dysphoria tend to desist.

16.     The studies that are cited to promote the argument of desistance a) are often misunderstood, and b) have significant flaws in their design. In these studies, both children who did not have gender dysphoria and children who did not identify as transgender were included in the analyses because they exhibited behaviors that did not conform to gender norms (for example, a cisgender boy who wanted to wear skirts or play with dolls). Because the vast majority of these children did not have gender dysphoria to begin with, the studies to not support the concept that gender dysphoria may simply be "outgrown." All of these studies used criteria for diagnosing "gender identity disorder" ("GID") under pre-2013 versions of the DSM that focused mainly on behaviors more appropriately associated with gender expression (and not gender identity) and had less specific criteria for distinguishing those with the disorder from other children. For example, in the DSM-IV-TR (the version prior to the updated DSM-5 criteria in 2013), indicated that four out of five criteria needed to be met for Criteria A for the GID diagnosis could include four criteria that did not overlap with gender identity, for example: "a. strong preference for playmates of the other sex, b. strong and persistent preferences for cross-sex roles in make believe play or persistent fantasies of being the other sex, c. in boys, preference for cross-dressing or simulating female attire; in girls, insistence on wearing only stereotypical masculine clothing, and d. intense desire to participate in the stereotypical games and pastimes of the other sex." Criterion B indicated a discomfort with gender role, which could include "for boys…a rejection of rough and tumble play; in girls,…a marked aversion toward normative clothing." In contrast, the prevailing clinical definition of gender dysphoria—a diagnosis that did not even exist when many of the studies Dr. Nangia cites were conducted—requires a persistent transgender identity as a component of the

diagnosis. Specifically, the current DSM-5-TR (American Psychiatric Association, 2022) gender dysphoria criteria require that children/adolescents identify with a gender that is different from their assigned gender for at least six months, which was not the case for any of the studies that are cited to indicate whether or not a youth will identify experience gender dysphoria in the future (see Temple Newhook et al., 2018 for a comprehensive review of the data).

17.    Steensma & Cohen-Kettinis (2018) agree that their data have been cited incorrectly to support claims of purportedly low persistence rates and have stated that their "studies cannot be used to support" (p. 226) the persistence estimation, in that they never calculated or reported rates of persistence/desistence. They also note that the negative social climate for transgender children and adolescents should be taken into account when reading the data (p. 226). They further state that their data did not actually reflect gender dysphoria in children, and they "expect that future follow up studies using the new diagnostic criteria may find higher persistence rates" (p. 226). Finally, they indicate that the terms "desistence" and "persistence" have been misused; they state that when they were researching youth, there were many youth who may have been "hesitating, searching, fluctuating, or exploring" and that those youth have been misclassified as desisting" (p. 227).

18.    Dr. Nangia also claims in her declaration that in her own clinical practice, "all children who have presented with gender incongruence and gender dysphoria have realigned with their natal sex with time and maturation as well as family support." Even the most conservative estimates of what is claimed to be "desistance" do not match a 100% desistance rate, which casts serious doubt on the reliability of Dr. Nangia's diagnostic abilities, her understanding of gender dysphoria, or her candor. For example, the only study that Dr. Nangia cites regarding desistance that is within the last two decades comes from Steensma et al. (2013), who noted that 63% of the

sample collected from 2000-2008 were placed in the "desisted" category, which means that Dr. Nangia's own clinical practice would be out of alignment with the data she is citing (note: see above for Steensma et al.'s own commentary for how they say that their data from this study are misrepresented in the detransitioning literature).

19.     Regarding detransition, there is a lack of consistency in how the terminology "detransition" is used throughout Dr. Nangia's report. The term "detransition" is extraordinarily misunderstood, misused, and mischaracterized. Academically, the term refers to the cessation or reversing of some or all components of medical, legal, and/or social interventions related to gender identity. The data indicate that the rates of such cessation or reversal are low and often attributable to external factors, such as finances, family, or social stigma. For example, in a meta-analysis focused on the cessation of hormone therapy for transgender individuals (Feigerlova, 2024), there was a range of cessation of this medical treatment from 0.8%-7.4%, which was obtained from fifteen observational studies involving 3,804 children and adolescents and 3,270 adult participants. The authors acknowledge that there can be many reasons for the cessation of this specific treatment, which could span external factors such as financial barriers and stigma or could include retransition. In one of the largest studies focused on detransition in the US (Turban et al., 2021), 82.5% of individuals who had indicated a history of detransitioning noted at least one external driving factor that influenced the transitioning (e.g., family or social stigma). Given that external factors are largely influential for detransitioning, the majority of people who are detransitioning are likely suppressing their transgender identity,  not changing or losing that core identity.

## V.     SOCIAL TRANSITION

20.     Dr. Nangia specifically cites a systematic review on social transition by Ruth Hall and others ("the Hall Review") for the point that "that there is little evidence of the benefits or harms of social transition for children and adolescents and that studies to date are of low quality,

emphasizing that more research is needed" (p. 33). The Hall Review in fact does note that studies found important impacts of social transition on mental health. For example, Hall Report noted the important impact that social transition has on reducing depression. It also notes that there were mixed impacts for suicidality and that anxiety did not decrease with social transition. As well, the systematic review indicated that gender dysphoria continued for many transgender youth after social transition. These findings are all in alignment with clinical trajectories for and researchers' and clinicians' understanding of mental health outcomes for transgender youth.

21.      First, when transgender youth start to socially transition, this is often when they are coming out to others; their depression often decreases because they no longer need to solely internalize their gender dysphoria. However, when a social transition occurs, the person's gender identity is often more visible, which can increase their anxiety around how others are treating them.

22.      Also, while social transitioning is an important first step for most transgender youth, it is often not the only step in their transition process and gender dysphoria and related distress is often highly present without additional interventions. Therefore, there can be a positive clinical impact that occurs based on social transitioning, but the positive impacts can be masked by the distress that remains present by additional necessary interventions (such as gender affirming medical care).

23.      The Hall Review does not go in depth for the studies that were included within their review, which limits readers' ability to draw conclusions from the review. For example, the Olson et al, (2016) study found that transgender youth who were supported prior to the age 12 demonstrated average mental health. The study used parental report of their child's anxiety and depression. Transgender youth's depressive symptoms did not differ from the population average. Mean anxiety symptoms of transgender youth were marginally higher (54) than the population

average (50) but still substantially below the clinical (>63) or even preclinical (>60) range. Hall discusses this study in the systematic review and highlights it as a study demonstrating that there were no differences in comparator groups. However, the fact that there were no differences in this study is demonstrative of a positive outcome from social transitioning, given that transgender youth's mental health was similar to the comparator group (cisgender youth) post social transition.

24.    Also, the data indicate that even when people are denied access to social and medical transition processes, they seek out these services once the barriers are decreased. Puckett et al.'s (2018) study notes there are many reasons why transition can be delayed, with financial barriers, availability of care, lack of knowledge of providers, and age being components of delays for gender transition. None of the participants in the Puckett et al (2018) study indicated that the delays were positive or appropriate, and other studies describe the harms associated with delays. For example, Horton's (2022) qualitative study describes parents' concerned comments about the harmful effects caused by delays in their children's social transition. outlines Indeed, in their scoping review, Osmetti et al., (2024) note that not being able to disclose one's transgender identity is associated with detrimental effects. The research does not support the claims made by Dr. Nangia that preventing transgender youth from socially transitioning will stop them from being transgender.

## VI.    SINGLE OCCUPANCY RESTROOMS AND TRANSGENDER YOUTH

25.    In Dr. Nangia's report, she indicated, "Dr. Budge Acknowledges that Cited Literature in Her Report Recommends Gender Neutral Bathrooms, Yet She Objects to the Accommodation of Single Occupancy Gender Neutral Bathrooms" (p. 35). It is important to acknowledge that I am not opposed to accommodations that include single occupancy gender neutral restrooms for those students who desire this accommodation. Single occupancy restrooms can be a fantastic accommodation for students who request it (including both transgender and

cisgender students who seek additional privacy for any reason); however, my primary objection is that simultaneously forcing a student to use a gender-neutral option and denying them the ability to use facilities that match their gender is, in my professional opinion, harmful to those students.

26.     In my previous declaration, I provided robust evidence that indicates the harm caused to transgender youth when they are denied access to restrooms aligned with their gender identity. For example, Price-Feeney et al.'s (2021) study indicates that transgender youth who were denied access to restrooms that corresponded to their gender identity reported high instances of depression and suicidality. In Seelman's (2016) study, the author statistically controlled for other variables that could account for mental health concerns, such as interpersonal discrimination outside of the denial of using restrooms aligned with a transgender person's gender identity, and even when controlling for these issues, the data indicate that being denied access to restrooms corresponding to one's gender identity was significantly associated with lifetime suicide attempts for young adults. As well, McGuire et al.'s (2022) qualitative study directly addresses the issue of attributing harm to the discrimination. Because this study is qualitative, the data directly provide quotes from research participants who connect the harms the denial of restroom use. Participants described being bullied and victimized in the restrooms of their assigned sex at birth, since their gender presentation usually does not match what would be expected for those using those restrooms. Participants also described the direct emotional harm caused by their experiences with discrimination linked to restrooms and others' expectations of which one they should be using.

27.     Beyond the data, I can also speak to my clinical experience and conversations I have had with patients who described the impact of the harm caused by not being able to use the restrooms that aligned with their gender identity. I have the experience of processing the trauma of clients who have been beaten up in restrooms aligned with their sex assigned at birth. I have

also provided coping skills to youth who have panic attacks when they consider having to use the restrooms aligned with their sex assigned at birth. I have also problem-solved with youth who hold their urine all day so they do not have to use the restrooms at school or who are dehydrated because they refuse to drink liquids for fear of having to use the restroom at school aligned with their sex assigned at birth. These are just a few examples of experiences of harm that I have heard firsthand. Finally, there is additional stigma and harm that can come from transgender students being required to use a teacher/staff restroom or single-user restrooms at school. Although this is often labeled an "accommodation," it is frequently considered and experienced by transgender students as stigmatizing and segregating. For example, Weihnardt et al.'s (2017) mixed method study notes: "One difficulty [transgender students] encountered was being restricted from multiple-user bathrooms altogether. Another difficulty was that single-user bathrooms were locked or located in faculty/staff-only areas, potentially exposing students to unwanted attention from peers and adults and being seen as different from their peers" (p. 147). In addition to the social exclusion and being made to feel othered and different, the process of requiring transgender students to use a faculty/staff restrooms or other single-user restrooms instead of the restroom with their peers also has the potential to out them to others as transgender. Unintentional outing of transgender youth to their peers can subject them to bullying and harassment from others and also increase fears of safety on behalf of the transgender youth (Brumbaugh-Johnson & Hull, 2019).

28.    In my personal experience discussing the experience of transgender youth being required to use restrooms other than those aligned with their gender identity, the youth have described intense feelings of shame, difference, embarrassment, being less than others, and dysphoria. Several youth have reported to me that they simply avoid using the restroom altogether if they are required to use restrooms other than those aligned with their gender identity.

## VII.   DR. NANGIA IS WRONG THAT PROVISO 1.120 PROTECTS TRANSGENDER YOUTH

29.      In her report, Dr. Nangia mentions that she thinks it is better for transgender students to be required to use single-occupancy restrooms because they often experience bullying and victimization in multiple occupancy restrooms. But restrictions on access to multiple occupancy restrooms are not a clinically appropriate solution to harassment.

30.      Transgender youth experience harassment and discrimination in many contexts, including all spaces in school. For example, in a nationwide study focused on transgender youth's experiences in schools, 40.1% of transgender students reported being bullied at school and 13.4% of transgender students reported they were threatened or injured by a weapon at school (Suarez et al., 2024). The 2021 report from GLSEN indicates that LGBTQ students avoid many different spaces in addition to restrooms/locker rooms in schools due to harassment and/or feeling unsafe—including gym class, athletic fields, cafeteria, certain classrooms, school buses, hallways/stairwells, and other areas of school grounds, and transgender students report greater harassment at schools than cisgender LGBQ students (Kosciw et al., 2022). When transgender youth are bullied in schools, they often avoid school (see Kosiw et al., 2022). Scholars have noted the detrimental impacts of missing school, including meta-analyses on absenteeism that note an association with self-harm and suicidality (Epstein et al., 2020). Meta-analyses also indicate the connection of school absenteeism with dropping out of school, which can have long term impacts such as economic deprivation and a diminishment of a multitude of quality of life factors (Kearney, 2008). Analyses also indicate the impact of short-term absences, such that even missing 10 classes in middle and high school reduces course grades by 17-18% of a standard deviation.

31.      By Dr. Nangia's logic, however, because transgender students face high rates of harassment, they should be excluded from school entirely and even perhaps additional spaces

above and beyond school. This is not a clinically appropriate response to the harassment transgender youth experience. When youth are bullied and discriminated against, schools should address the discrimination and harassment, rather than excluding a class of people from a particular space because of the risk that unaddressed harassment might occur.. In my declaration, I note that transgender students are more likely to experience discrimination from cisgender students than the other way around—but this does not mean that they should not be able to have access to spaces where they must get their fundamental needs met. In fact, research indicates that when restroom and locker room restrictions are placed on transgender youth, this is associated with greater instances of sexual assault toward transgender youth (Murchison et al., 2019).

## VIII.  DR. NANGIA MISREPRESENTS THE THREAT OF TRANSGENDER STUDENTS TO CISGENDER STUDENTS' "FELT SAFETY"

32.    In her report and in her deposition, Dr. Nangia fails to provide any evidence that supports her contention that transgender youth are an actual or perceived threat to the safety of cisgender youth in restrooms. Dr. Nangia cites the use of Trust-Based Relational Interventions (TBRI) for cisgender youth who have a complex trauma history and are struggling with felt safety. Experts who discuss TBRI indicate that one major intervention of TBRI is to assist youth with a complex trauma history to use evidence to help them understand when they are safe versus not safe. For example, experts give the example that youth in foster care situations may not have had food in the past and are worried about having enough food, so foster care providers can show them evidence of having food in the house (see Purvis et al., 2013). TBRI experts also talk about the importance of helping children to learn grounding exercises, amongst other behavioral techniques, to help them to manage their emotions while understanding that situations they may worry about being unsafe are actually safe (Purvis et al. 2017). In using "felt safety" as an excuse to exclude transgender youth who pose no threat to their classmates, Dr. Nangia ignores an important central

principle of the TBRI framework: that sometimes young people fear people or things that do not actually pose a threat to them, and when that occurs, the solution is to help them understand they are safe, not to feed their anxieties. Moreover, in my review of the science focused on TBRI, I could not find any reference to cisgender youth being afraid to use restrooms with transgender youth due to concerns of felt safety. Accordingly, it is my opinion that Dr. Nangia is misrepresenting the implications of the TBRI research as it relates to transgender youth and restrooms. As well, she improperly extrapolates her argument to students without complex trauma history (for example, any cisgender girl) without research or evidentiary support as a way to exclude transgender youth from restrooms aligning with their gender identity.

33.      As well, Dr. Nangia is unable to demonstrate that cisgender youth feel unsafe with transgender youth in restrooms for reasons that are not rooted in prejudice. At her deposition (p. 114), Dr. Nangia was asked why a cisgender youth's supposed fear of transgender peers in the restroom is a more legitimate basis for policy than a person's fear of using sharing restrooms with African Americans in the 1950s. She said (p. 114-15), vaguely, that cisgender students' alleged fears are based in "development, psychosocial development, physical development, things that have been in place very good time and are rooted a good bit in science and literature so it's a different scenario," but she is unable to point to any data that supports her assertions.

34.      I have been unable to find any data that indicate that cisgender people's safety is generally at risk due to transgender people using multiple occupancy restrooms; specifically, there are no data that indicate that transgender people (compared to cisgender people) are proportionally more violent or harassing toward cisgender people in restroom spaces. Therefore, if cisgender people have a concern about felt safety in the restroom due to the presence of transgender people, by definition, this concern about felt safety is not rooted in evidence. I am in agreement with Dr.

Nangia that students should be welcome to request single-occupancy restrooms should that accommodation work best for them, and therefore this accommodation can be requested for any student within the school system. However, specifically excluding students from being able to use the restroom that aligns with their gender identity is particularly harmful (see DeChants et al., 2024; Horne et al., 2022; Herman, 2013; McGuire et al., 2022; Price-Feeney et al., 2021).

## IX.   TRANSGENDER YOUTH IDENTIFICATION AND GENDER DYSPHORIA DIAGNOSIS

35.     The State of South Carolina has argued that I said that a psychologist must clinically diagnose (or at least individually assess) a person before they can be considered transgender; but the State is taking the quoted portion of my deposition out of context. Nowhere in my deposition did I make statements that support their claim. Instead, in my deposition (at 36), I noted: "Well, in our field we support the idea of taking an individualized approach to each person because everybody is different. We do have, you know, standardized criteria that we use for diagnosis. But yes, I do think that it's important to take each individual into account. While, also, taking into account kind of field-specific pieces related to diagnostic criteria. That's true of how all type of psychological evaluations work." When answering the question posed by the state, I was affirming that psychologists should take an individualized approach to assessing patients, and I was providing information about how the assessment process works, which is true for any assessment with any client (cisgender or transgender). However, in my statement I did not indicate that it was a requirement for a psychologist (or any mental health provider) to diagnose someone with gender dysphoria as the only way to ensure that someone can be deemed transgender.

36.     Given that gender identity is an internal experience and that transgender identity itself is not a diagnostic category (as opposed to a gender dysphoria diagnosis that a transgender person may also have), a psychologist or mental health provider's designation is not necessary to

determine that someone identifies as transgender. In my clinical experience, when a person identifies as transgender, they typically *are* transgender; that is, they have a persistent, insistent and consistent experience of their gender that is not congruent with their sex assigned at birth. It is true that a mental health provider or medical provider's assessment is required for a formal diagnosis of gender dysphoria (that is, the clinically significant distress associated with having a gender identity incongruent with one's assigned sex). There are many reasons, however, why a transgender youth might not have a formal diagnosis and still be recognized by formal systems as a transgender person, including: a lack of access to a medical provider, stigma-related anxiety, and families adjusting to a social transition prior to seeking mental health care or medical support. In a recent study, out of 5,637 transgender adolescents, 2/3 of the sample had not disclosed their gender identity to medical professionals, and younger transgender adolescents (ages 13-14) disclosed even less to medical professionals (McKay & Watson, 2020). Wagner et al. (2021) note that there are significant barriers to receiving a gender dysphoria diagnosis for transgender adolescents, with the data indicating that there were disparities for transgender girls to receive the diagnosis when compared to transgender boys. Youth who were ages 10-14 were also less likely to receive a gender dysphoria diagnosis. In addition, the rise in criminalizing gender affirming care for transgender youth across the United States will also likely make it more challenging for transgender youth to obtain formal gender dysphoria diagnoses (Abreu et al., 2022).

37.     Given the reasons noted above, self-identification is the best method we currently have to estimate transgender populations in population-based studies. The Williams Institute report (Herman et al., 2022) is widely cited (a Google Scholar search indicates 500 citations as of January 27, 2025) and regarded as reliable for population based estimates. In 2022, the Williams Institute provided population estimates based on the 2017 and 2019 Youth Risk Behavior Survey and the

2017-2020 Behavioral Risk Factor Surveillance System. The YRBS is one of the most extensive nation-wide surveys of high school student health risk behaviors, and is considered one of the best ways to measure high school student health (Underwood et al., 2020). Alongside the YRBS, BRFSS is also considered one of the most extensive nation-wide surveys for youth and health, with particular reliability of data regarding mental health and quality of life (Pierannunzi et al., 2013). A Google Scholar search indicates that these surveys are mentioned in over 30,000 (YRBS) and 50,000 (BRFSS) academic publications each. Given that the Williams Institute published its estimates in 2022, they were using the most recent data available to them for both the YRBS and the BRFSS. These datasets are usually publicly available 1-2 years after the data have been collected. It can take a significant amount of time to analyze datasets, and therefore the data currently discussed in the Williams Institute report is up to date.

38.     The State of Carolina critiques the estimates in my declaration by indicating that I did not take into account the number of transgender students who might not attend schools in person, and it uses the Gohil et al., (2021) study to bolster this claim. However, this study only follows parents of transgender youth who were part of the Riley Hospital for Children's gender health clinics in Indiana and does not apply to percentages of youth in South Carolina. Moreover, the comparator group did not explicitly exclude transgender youth. In any event, even if the same logic were to be applied to South Carolina students, the data in the Indiana study only indicate that there was a difference of 18% in the percentage of transgender youth and youth in the hospital's comparator clinic who attended a non-traditional schooling program. Even if my South Carolina estimate was reduced by 18% to correspond to the Indiana data, there would still be an estimated 2,718 transgender students in the state attending public schools, and certainly more than 40 transgender youth statewide who would be impacted by the restrictions in restroom use in public

K-12 schools. As well, in my clinical experience, transgender students prefer to use the restroom that aligns with their gender identity, and therefore there are more than 40 transgender students who would be impacted by the restroom restrictions outlined in this case.

## X. DR. NANGIA AND THE DEFENDANTS' CLAIMS ABOUT MY "BIAS"

39.     In her report, Dr. Nangia indicates: "Dr. Budge does not even consider the felt safety of students who are not transgender because she deems them prejudiced" and that this statement "demonstrates bias." As noted earlier in this report, I indicate that there are no data to support the fact that cisgender students' safety is threatened with the general presence of transgender students in restrooms; I have not been able to locate data, nor does Dr. Nangia cite data, to support the proposition that transgender people are more likely to be violent or harass people in restrooms in comparison to the cisgender people who use multiple occupancy restrooms. There is no evidence-based reason for cisgender students to feel unsafe in restrooms with transgender students. Therefore, my opinion that, to the extent cisgender students feel unsafe in restrooms with transgender students, they are basing their assessment on implicit or overt bias, rather than evidence, stands.

40.     In her report, Dr. Nangia also indicates: "Dr. Budge states that she has advocated for social transition in all her patients as she believes it reduces gender dysphoria" (p. 33). In my deposition, I indicated that social transition was appropriate for the transgender adolescents I have seen in my clinical practice who had met criteria for gender dysphoria and that this aligns with the WPATH standards of care and clinical guidelines for working with transgender adolescents. Dr. Nangia fails to note the part of my deposition where I also noted that I have been in situations where I consulted with other mental health providers where I did not recommend social transition or medical transition as a course of treatment.

41.     In addition, the State of South Carolina makes allegations that I am an activist as

a way to discredit my work. I have provided testimony that I describe myself as an advocate and that this is rooted in my ethical obligation as a psychologist to ensure that the practice of psychology with transgender people is rooted in an evidence-based practice. The APA (2015) guidelines for working with transgender people specifically stipulate: "In educational settings, psychologists may advocate for TGNC [transgender and gender nonconforming] youth on a number of levels…" (p. 839) and provide multiple examples of how psychologists may advocate for transgender youth. In an explanation of these guidelines, Singh & Dickey (2016) specifically note that psychological and counseling practice with transgender people includes issues: "that are culturally-relevant for TGNC clients and their multiple social identities, address the influence of social inequities on the lives of TGNC clients, enhance TGNC client resilience and coping, advocate to reduce systemic barriers to TGNC mental and physical health, and leverage TGNC client strengths." Therefore, in describing myself as an advocate in the work, I follow my own professional guidelines and recommendations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Stephanie L. Budge, Ph.D.

Executed on _____January 29, 2025_____.

23

# EXHIBIT A

## Bibliography

## BIBLIOGRAPHY

Abreu, R. L., Sostre, J. P., Gonzalez, K. A., Lockett, G. M., Matsuno, E., & Mosley, D. V. (2022). Impact of gender-affirming care bans on transgender and gender diverse youth: Parental figures' perspective. *Journal of family psychology*, *36*(5), 643.

American Academy of Pediatrics (2018) cited via Rafferty, J., Yogman, M., Baum, R., Gambon, T. B., Lavin, A., Mattson, G., ... & Committee on Psychosocial Aspects of Child and Family Health. (2018). Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. *Pediatrics*, *142*(4).

American Medical Association (2018). AMA *Adopts New Policies at 2018 Meeting*. Retrieved from https://www.ama-assn.org/press-center/press-releases/ama-adopts-new-policies-2018-interim-meeting

American Psychiatric Association (2017). *Definitions of Gender, Sex, Sexual Orientation, and Pronoun Usage.* https://www.psychiatry.org/psychiatrists/diversity/education/transgender-and-gender-nonconforming-patients/definitions-and-pronoun-usage

American Psychological Association. (2014). *Answers to your questions about transgender people, gender identity, and gender expression*. Retrieved from http://www.apa.org/topics/lgbt/transgender.aspx

American Psychological Association (2021). *APA Resolution on Gender Identity Change Efforts.* Retrieved from https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf

American Psychological Association. (2015). Guidelines for psychological practice with transgender and gender nonconforming people. *American psychologist,* 70(9), 832-864.

American Psychiatric Association. (2000). *Diagnostic and statistical manual of mental disorders* (4th ed., text rev.).

American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders* (5th ed.). https://doi.org/10.1176/appi.books.9780890425596

American Psychiatric Association. (2022). *Diagnostic and statistical manual of mental disorders* (5th ed., text rev.). https://doi.org/10.1176/appi.books.9780890425787

Austin, A., Craig, S. L., D'Souza, S., & McInroy, L. B. (2022). Suicidality among transgender youth: elucidating the role of interpersonal risk factors. *Journal of Interpersonal Violence*, 37(5-6), NP2696-NP2718.

Brumbaugh-Johnson, S. M., & Hull, K. E. (2019). Coming out as transgender: Navigating the social implications of a transgender identity. *Journal of Homosexuality*, 66(8), 1148-1177.

Cass, H. (2024). *The Cass Review.* https://cass.independent- review.uk/home/publications/final-report/

Coleman, E., Radix, A. E., Bouman, W. P., et al. (2022) Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, *International Journal of Transgender Health*, 23:sup1, S1-S259.

Cretella MA, Rosik CH, Howsepian AA. (2019). Sex and gender are distinct variables critical to health: Comment on Hyde, Bigler, Joel, Tate, and van Anders (2019). *American Psychologist.* Oct;74(7):842-844. doi: 10.1037/amp0000524. PMID: 31580112. 32.

DeChants, J. P., Price, M. N., Nath, R., Hobaica, S., & Green, A. E. (2024). Transgender and nonbinary young people's bathroom avoidance and mental health. *International Journal of Transgender Health*, 1-9.

Durwood, L., Eisner, L., Fladeboe, K., Ji, C. G., Barney, S., McLaughlin, K. A., & Olson, K. R. (2021). Social support and internalizing psychopathology in transgender youth. *Journal of Youth and Adolescence*, 50(5), 841-854.

Epstein, S., Roberts, E., Sedgwick, R., Polling, C., Finning, K., Ford, T., ... & Downs, J. (2020). School absenteeism as a risk factor for self-harm and suicidal ideation in children and adolescents: a systematic review and meta-analysis. *European Child & Adolescent Psychiatry*, *29*, 1175-1194.

Feigerlova, E. (2024). Prevalence of detransition in persons seeking gender-affirming hormonal treatments: a systematic review. *The Journal of Sexual Medicine*, qdae186.

Gohil, A., Donahue, K. L., & Eugster, E. A. (2021). Nontraditional school enrollment in transgender and gender-diverse youth. *Journal of Adolescent Health*, *68*(1), 207-209.

Grijseels, D. M. (2024). Biological and psychosocial evidence in the Cass Review: a critical commentary. *International Journal of Transgender Health*, 1-11.

Guyatt, G. H., Oxman, A. D., Kunz, R., Vist, G. E., Falck-Ytter, Y., & Schünemann, H. J. (2008). What is "quality of evidence" and why is it important to clinicians?. *British Medical Journal,* 336(7651), 995-998.

Hall, R., Taylor, J., Hewitt, C. E., Heathcote, C., Jarvis, S. W., Langton, T., & Fraser, L. (2024). Impact of social transition in relation to gender for children and adolescents: a systematic review. *Archives of Disease in Childhood*.

Heiden-Rootes, K., McGeorge, C. R., Salas, J., & Levine, S. (2022). The effects of gender identity change efforts on Black, Latinx, and White transgender and gender nonbinary adults: Implications for ethical clinical practice. *Journal of Marital and Family Therapy*, *48*(3), 927-944.

Herman, J. L. (2013). Gendered restrooms and minority stress: The public regulation of gender and its impact on transgender people's lives. *Journal of Public Management & Social Policy*, *19*(1), 65.

Herman, J.L., Flores, A.R., O'Neill, K.K. (2022). *How Many Adults and Youth Identify as Transgender in the United States?* The Williams Institute, UCLA School of Law.

Horne, S. G., McGinley, M., Yel, N., & Maroney, M. R. (2022). The stench of bathroom bills and anti-transgender legislation: Anxiety and depression among transgender, nonbinary, and cisgender LGBQ people during a state referendum. *Journal of Counseling Psychology*, 69(1), 1-13.

Horton, C. (2022). "I Was Losing That Sense of Her Being Happy"—Trans Children and Delaying Social Transition. *LGBTQ+ Family: An Interdisciplinary Journal*, 1-17.

Horton, C. (2024). The Cass Review: Cis-supremacy in the UK's approach to healthcare for trans children. *International Journal of Transgender Health*, 1-25.

Johns, M. M., Beltran, O., Armstrong, H. L., Jayne, P. E., & Barrios, L. C. (2018). Protective factors among transgender and gender variant youth: A systematic review by socioecological level. *The Journal of Primary Prevention*, *39*, 263-301.

Kearny, C. A. (2008). School absenteeism and school refusal behavior in youth: A contemporary review. *Clinical Psychology Review*, *28*(3), 451-471.

Kosciw, J. G., Clark, C. M., & Menard, L. (2022). *The 2021 National School Climate Survey: The experiences of LGBTQ+ youth in our nation's schools*. New York: GLSEN.

Lee, H., Operario, D., Restar, A. J., Choo, S., Kim, R., Eom, Y. J., ... & Kim, S. S. (2023). Gender identity change efforts are associated with depression, panic disorder, and suicide attempts in South Korean transgender adults. *Transgender health*, *8*(3), 273-281.

Marinov, G. K. (2020). In Humans, Sex is Binary and Immutable. *Academic Questions*, 33(2).

McGuire, J. K., Okrey Anderson, S., & Michaels, C. (2022). "I don't think you belong in here:" The impact of gender segregated bathrooms on the safety, health, and equality of transgender people. *Journal of Gay & Lesbian Social Services*, 34(1), 40-62.

McKay, T. R., & Watson, R. J. (2020). Gender expansive youth disclosure and mental health: Clinical implications of gender identity disclosure. *Psychology of Sexual Orientation and Gender Diversity*, *7*(1), 66.

McNamera, N., Baker, K., Connelly, K., et al. (2024) An Evidence-Based Critique of "The Cass Review" on Gender-affirming Care for Adolescent Gender Dysphoria. https://law.yale.edu/sites/default/files/documents/integrity-project_cass-response.pdf

3

Mizock, L., Mougianis, E., Meier, C., & Moundas, S. (2015). Gender Diversity and Transgender Identity in Youth. *Journal of Sexual Medicine*, *5*, 1892-1897.

Murchison, G. R., Agénor, M., Reisner, S. L., & Watson, R. J. (2019). School restroom and locker room restrictions and sexual assault risk among transgender youth. *Pediatrics*, *143*(6).

Olson, K. R., Durwood, L., DeMeules, M., & McLaughlin, K. A. (2016). Mental health of transgender children who are supported in their identities. *Pediatrics*, 137(3).

Osmetti, L. A., Allen, K. R., & Kozlowski, D. (2024). Shortcomings of transgender identity concealment research: a scoping review of associations with mental health. *International journal of transgender health*, 1-25.

Pierannunzi, C., Hu, S. S., & Balluz, L. (2013). A systematic review of publications assessing reliability and validity of the Behavioral Risk Factor Surveillance System (BRFSS), 2004–2011. *BMC Medical Research Methodology*, *13*, 1-14.

Price-Feeney, M., Green, A. E., & Dorison, S. H. (2021). Impact of bathroom discrimination on mental health among transgender and nonbinary youth. *Journal of Adolescent Health*, *68*(6), 1142-1147.

Puckett, J. A., Cleary, P., Rossman, K., Mustanski, B., & Newcomb, M. E. (2018). Barriers to gender-affirming care for transgender and gender nonconforming individuals. *Sexuality Research and Social Policy*, *15*, 48-59.

Purvis, K. B., Cross, D. R., Dansereau, D. F., & Parris, S. R. (2013). Trust-based relational intervention (TBRI): A systemic approach to complex developmental trauma. *Child & Youth Services*, *34*(4), 360-386.

Purvis, K., Howard, A. R. H., & Call, C. (2017). Trust-based relational intervention. *Buckwalter KD & Reed D (Eds.,), Attachment theory in action: Building connections between children and parents*, pp. 143-156.

Seelman, K. L. (2016). Transgender adults' access to college bathrooms and housing and the relationship to suicidality. *Journal of Homosexuality*, *63*(10), 1378-1399.

Singh, A. A. & dickey, l. (2016). Implementing the APA guidelines on psychological practice with transgender and gender nonconforming people: A call to action to the field of psychology. *Psychology of Sexual Orientation and Gender Diversity*, 3(2), 195.

Steensma, T. D., McGuire, J. K., Kreukels, B. P., Beekman, A. J., & Cohen-Kettenis, P. T. (2013). Factors associated with desistence and persistence of childhood gender dysphoria: a quantitative follow-up study. *Journal of the American Academy of Child & Adolescent Psychiatry*, *52*(6), 582-590.

Steensma, T. D., & Cohen-Kettenis, P. T. (2018). A critical commentary on follow-up studies and "desistence" theories about transgender and gender non-conforming children. *International Journal of Transgenderism*, *19*, 225-230.

Suarez, N. A. , Trujillo, L., McKinnon II et al. (2024). Disparities in school connectedness, unstable housing, experiences of violence, mental health, and suicidal thoughts and behaviors among transgender and cisgender high school students—Youth Risk Behavior Survey, United States, 2023. *MMWR supplements*, *73*.

Temple Newhook, J., Pyne, J., Winters, K., Feder, S., Holmes, C., Tosh, J., ... & Pickett, S. (2018). A critical commentary on follow-up studies and "desistance" theories about transgender and gender-nonconforming children. *International Journal of Transgenderism*, 19, 212-224.

Turban, J. L., Beckwith, N., Reisner, S. L., & Keuroghlian, A. S. (2020). Association between recalled exposure to gender identity conversion efforts and psychological distress and suicide attempts among transgender adults. *JAMA Psychiatry*, *77*(1), 68-76.

Turban, J. L., Loo, S. S., Almazan, A. N., & Keuroghlian, A. S. (2021). Factors leading to "detransition" among transgender and gender diverse people in the United States: A mixed-methods analysis. *LGBT health*, *8*(4), 273-280.

Underwood JM, Brener N, Thornton J, et al. (2019). Overview and Methods for the Youth Risk Behavior Surveillance System — United States, *MMWR Supplements*, 1–10. DOI: http://dx.doi.org/10.15585/mmwr.su6901a1.

Veale, J. F., Tan, K. K., & Byrne, J. L. (2022). Gender identity change efforts faced by trans and nonbinary people in New Zealand: Associations with demographics, family rejection, internalized transphobia, and mental health. *Psychology of Sexual Orientation and Gender Diversity*, 9(4), 478.

Wagner, S., Panagiotakopoulos, L., Nash, R., Bradlyn, A., Getahun, D., Lash, T. L., ... & Goodman, M. (2021). Progression of gender dysphoria in children and adolescents: a longitudinal study. *Pediatrics*, 148(1).

Weinhardt, L. S., Stevens, P., Xie, H., Wesp, L. M., John, S. A., Apchemengich, I., ... & Lambrou, N. H. (2017). Transgender and gender nonconforming youths' public facilities use and psychological well-being: a mixed-method study. *Transgender Health*, 2(1), 140-150.